UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| Dakotans for Health,<br><br>    Plaintiff,<br><br>vs.<br><br>South Dakota Governor Kristi L. Noem, in her official capacity, South Dakota Attorney General Jason Ravnsborg, in his official capacity, and South Dakota Secretary of State Steve Barnett, in his official capacity,<br><br>    Defendants. | 4:21-CV-4045-LLP<br><br><br><br>MEMORANDUM OPINION<br>AND ORDER |

   Plaintiff brought this action against Kristi Noem, in her official capacity as Governor of the State of South Dakota, Jason Ravnsborg, in his official capacity as Attorney General of South Dakota, and Steve Barnett, in his official capacity as Secretary of State. Plaintiff alleges three violations of constitutional law with regard to a bill enacted by the South Dakota Legislature, Senate Bill 180 ("SB 180.") SB 180 went into effect on July 1, 2020. On Wednesday, April 28, 2021, both parties, represented by counsel, presented argument at a hearing on Plaintiff's motion for a Temporary Restraining Order. At the conclusion of the oral argument, the Court granted a Temporary Restraining Order. The parties agreed that the Court could decide Plaintiff's request for a preliminary injunction based on the record already before the Court. The Court took the preliminary injunction issue under advisement at the conclusion of the hearing and, for the following reasons, now finds that a preliminary injunction is appropriate.

## PROCEDURAL BACKGROUND

   On March 30, 2021, Plaintiff brought this suit against Defendants, seeking a declaratory judgment that: 1) SB 180's disclosure requirements for paid circulators violates the First Amendment by compelling pre-circulation disclosure and public availability of personal information about paid petition circulators that makes them subject to harassment; 2) SB 180's disqualification of all signatures obtained due to insignificant compliance errors violates the First

1

Amendment because it is not justified by relevant and legitimate state interests; and 3) SB 180's overt discrimination against paid circulators violates the First Amendment by burdening political speech and discriminating against ballot campaigns that use paid petition circulators. (Doc. 1.) Plaintiff sought preliminary and permanent injunctive relief.

On April 14, 2021, Plaintiff moved for a Temporary Restraining Order ("TRO") and a Preliminary Injunction seeking the same relief. (Doc. 4.) James Moore appeared as counsel for Defendants on April 15, 2021, and he advised the Court that Defendants could file their response to the request for a TRO by April 26, 2021. (Doc. 11.) Oral argument was held on the motion for TRO on Wednesday, April 28, 2021. (Doc. 20.) The Court orally granted a TRO at the conclusion of the hearing. (Doc. 23, Transcript, p. 6.) The parties agreed that the Court could decide Plaintiff's request for a preliminary injunction based on the record. (Doc. 23, p. 7; Doc. 27, p. 42.) The parties also stipulated that the TRO could remain in effect for up to 45 days while the Court prepared a written decision on Plaintiff's request for a preliminary injunction. On April 29, 2021, the Court issued an order concluding that "for analysis purposes, Senate Bill 180 is severable." (Doc. 22.) The written TRO was issued on April 30, 2021. (Doc. 24.) The Order granted Plaintiff's motion for a temporary restraining order "to the extent that the Secretary of State is temporarily restrained from disclosing any information filed by a paid petition circulator as required by SB 180." (*Id.*)

## FACTUAL BACKGROUND

The focus of this case is Senate Bill 180 enacted by the South Dakota Legislature in 2020 to repeal and revise certain provisions of South Dakota law regarding the petition circulation process. (Doc. 7-9.) Plaintiff claims this legislation violates protections found in the First Amendment. A brief history of the development of SB 180 gives perspective on Plaintiff's claims.

In 2018, the Speaker of the South Dakota House of Representatives proposed Initiated Measure 24 ("IM 24.") IM 24 barred out-of-state contributions to South Dakota ballot question committees. *See SD Voice v. Noem*, 380 F. Supp. 3d 939, 944 (D.S.D. 2019). The Governor wrote the "pro" ballot statement supporting it, in which he complained about "out-of-state interests" using the initiative process to bring their ideas to South Dakota. IM 24 was held to be unconstitutional in violation of the First Amendment because it unlawfully restricted political speech. *See id*. After IM 24 was challenged, the dominant political party enacted House Bill 1094 (2019) ("HB 1094"). (Doc. 7-8.) One of the House sponsors of HB 1094, Representative Jonathon

Hansen, stated in an interview that the purpose of HB 1094 was to prohibit out-of-state petition circulators from circulating petitions in-state. In the interview, Representative Hansen referred to HB 1094 as prohibiting "professional out-of-state petition circulators who are trying to bring their California and Massachusetts liberal agendas" to the State. In this case, Hansen testified that SB 180, and its predecessor HB 1094, were passed to address concerns about election integrity, risk of fraud and corruption, and transparency and accountability in the wake of the 2018 petition process. (Doc. 17, Hansen Affidavit, ¶¶ 11,12.)

After a bench trial before the Honorable Charles B. Kornman, HB 1094 was held to be unconstitutional, and the district court permanently enjoined HB 1094's enforcement. *See SD Voice v. Noem* (*SD Voice II*), 432 F.Supp.3d 991, 994 (D.S.D. 2020). The defendants appealed the permanent injunction against enforcing HB 1094, and the plaintiffs cross-appealed the district court's failure to decide their challenge to a statutory requirement predating HB 1094 that required ballot petitions to be filed one year before the next general election. *See SD Voice v. Noem*, 987 F.3d 1186 (8th Cir. 2021).

SB 180 was enacted following the district court's decision on HB 1094 in *SD Voice II* and while the case was on appeal before the Eighth Circuit. In its decision on appeal of *SD Voice II*, the Eighth Circuit held that the defendants' appeal was moot in part because the plaintiffs insisted that SB 180 did not disadvantage them in the same fundamental way as HB 1094 did. 987 F.3d at 1190. Because the district court's decision in *SD Voice II* did not resolve the plaintiffs' challenge to the time to file ballot petitions, the Eighth Circuit held that it was not a final appealable order, dismissed the plaintiffs' cross-appeal for lack of jurisdiction, and remanded the one-year requirement issue to the district court. 987 F.3d at 1191–92. The district court has not yet decided the issue on remand.

SB 180 compels pre-petition circulation disclosure and public availability of personal information about paid petition circulators. It also requires paid circulators to update their information within seven days of any changes. It provides:

> Prior to circulation of any petition for a ballot measure, a paid circulator shall submit an application to the secretary of state, obtain a circulator identification number, and be included in a directory of registered paid circulators. For each ballot measure on which a paid circulator seeks to circulate a petition, the paid circulator shall certify the circulator's name, that the circulator is at least eighteen years of age, physical address of current residence, physical address of prior residence if current residence is less than one year, email address, phone number, state of issuance for driver license or other government-

issued identification, state of voter registration, the name of the petition sponsor, and whether the paid circulator is a registered sex offender. The certification under this section shall be submitted to the office of the secretary of state. If a paid circulator fails to file the registration required by this section before circulating a petition, or if the registration is incomplete, or if any statement included in the paid circulator's certification is determined to be false, any signatures collected by the paid circulator are void and may not be counted. Petition sponsors shall provide a list to the secretary of state of any person acting as a paid circulator for the sponsor's ballot measure and the rate of compensation.

An application submitted under this section may be filed by electronic transmission in accordance with methods approved by the secretary of state. To be timely filed, any application received by electronic transmission shall be legible when received by the means it was delivered.

A paid circulator and petition sponsor shall update any information required under this section with the secretary of state not more than seven days of any change.

SDCL § 2-1-1.5. Public disclosure of this information is required by SDCL § 2-1-1.6:

The secretary of state shall develop and maintain a directory, available upon request and payment of reasonable fees, that contains information provided by each paid circulator under § 2-1-1.5. Providing a copy of the application submitted under § 2-1-1.5, together with any update to the information contained in the application, is sufficient to fulfill the requirements of this section. Any information contained in the directory shall be a public record for purposes of chapter 1-25.

SDCL § 2-1-1.6.

HB 1094 applied to all circulators, while SB 180 only applies to paid circulators. The public disclosure under HB 1094 required petition circulators to wear an ID number displayed on a badge, while SB 180 no longer has this requirement. SB 180 does not require anything on the badge other than showing that the circulator is paid in connection with a ballot measure. (Doc. 21, Barnett Amended Affidavit, ¶ 8.) Defendants admitted at oral argument in *SD Voice II* both that "the [paid circulator] directory is still available ahead of time [in SB 180 as in HB 1094]" and that the vast majority of SB 180 is still consistent with HB 1094. SB 180's public directory is available before the time of petition circulation, but the circulator's badge does not identify the name or any other identifying information about the circulator. There is no evidence of how an individual could match the public directory to the unidentified circulators at the time of contact on the street.

SB 180 requires that both "[a] paid circulator and petition sponsor shall update any information required under this section with the secretary of state [within] not more than seven days of any change." HB 1094 required the same. Judge Kornmann in *SD Voice II* ruled that this

4

language is "broad enough that updates could be required indefinitely, at least until the measure is voted on or fails." 432 F.Supp.3d at 1001.

In his amended affidavit, Steve Barnett avers that there is no enforcement provision allowing the Secretary of State to void signatures for a circulator's failure to comply with the seven-day updating requirement. (Doc. 21, Barnett Amended Affidavit, ¶ 10.) Rather, according to Defendants, anyone challenging signatures based on a circulator's failure to update information would need to seek a judicial determination. See SDCL §§ 2-1-17.1 and 2-1-18. (Doc. 28, p. 16, ¶ 70.)

In his affidavit, Hansen testified that one issue in particular surrounding the 2018 election season and IM 24 created the need for HB 1094 and, subsequently, SB 180. Specifically, nearly 45 percent of the sample signatures for a ballot measure in 2018 were deemed invalidated in a mandamus case. (Doc. 17, Hansen Affidavit, ¶¶ 4-10). *See also Johnson, et al. v. Krebs*, 32CIV18-103 (Sixth Jud. Cir. 2018). According to Representative Hansen, paid circulators gathered the signatures that were challenged, and many of the petition circulators were out-of-state, paid circulators teamed up with a resident circulator to gather more signatures. (Hansen Aff. ¶ 5.) Private investigators were hired to locate the circulators and question them concerning the validity of the signatures they gathered. (*Id.* ¶ 7.) Some of the circulators went unlocated. (*Id.* ¶ 8.)

Steve Barnett testified that there were four ballot measures in 2018 that did not qualify for the general election ballot based on invalidated signatures (Doc. 16, Barnett Affidavit, ¶ 12.) This was compared to one ballot measure that did not qualify based on invalidated signatures in 2016 and zero ballot measures that did not qualify for the ballot based on invalidated signatures in 2014. (*Id.* at ¶¶ 10-11.) Defendants argue that the need for disclosure of paid circulators has been demonstrated:

> to promote election integrity and assuage the appearance of corruption after the invalidation of nearly 45% of the signatures in the sample of signatures done in relation to IM 26 - - disqualifying it along with three other ballot measures from appearing on the 2018 General Election Ballot. (Hansen Aff. ¶ 9, Ex. A.) Evidence in *Johnson, et al. v. Krebs* established that when issues arose trying to validate those signatures - - many of which resulted from paid circulators - - those circulators could not be located. (Hansen Aff. ¶¶ 5-8.)

(Doc. 14, p. 19.)

Plaintiff is a South Dakota ballot question committee dedicated to improving healthcare and health outcomes. Rick Weiland is the Chair of Plaintiff Dakotans for Health. Plaintiff drafted a proposed South Dakota constitutional amendment to reform Medicaid to cover the working poor, i.e., those earning between 100% and 138% of the federal poverty level. Thirty-eight states have already reformed Medicaid to cover the working poor. Plaintiff submitted the proposed constitutional amendment to the Legislative Research Council for review, and to the Attorney General for a ballot explanation, and took all other acts needed to obtain the petitions that will be used to collect the signatures needed to place the measure on the November 8, 2022, general election ballot. It obtained approval to circulate its petitions on November 5, 2020. Under current South Dakota law, Plaintiff is required to submit these signatures to the Secretary of State by November 8, 2021.

In order to place a constitutional amendment to expand Medicaid on the 2022 ballot, Plaintiff must submit at least 33,921 valid signatures to the Secretary of State by November 8, 2021. Plaintiff could have chosen to submit an initiated law to expand Medicaid, which would have required only 16,961 valid signatures to appear on the ballot. In Weiland's opinion, this would have been a fool's errand, because he asserts that the South Dakota Legislature has proven itself hostile to Medicaid expansion, and has a track record of overturning or significantly weakening initiated laws that it does not like. Defendants disagree with this assertion and introduced evidence that the South Dakota Legislature does not have a history of weakening laws enacted by ballot measure. (Doc. 15, Saltzer Affidavit.) Weiland believes that in order to collect 33,291 valid signatures, it is reasonably necessary to collect 65,000 signatures, because many signatures will be found invalid.

Plaintiff employs one paid circulator, Pam Cole, to circulate its petitions, and expects to employ more paid circulators in the future. Pam Cole has consulted and volunteered on numerous legislative and statewide campaigns and ballot measures. Though the names and addresses of registered voters are publicly available, she doesn't recall ever having to publicly disclose her home address, telephone number, and email address. Although Pam Cole was willing to disclose this information in order to become a paid circulator, she is sure, based on nearly twenty years' experience in South Dakota politics, that many potential paid circulators who do not have her level of commitment will be unwilling to disclose their name, home address, telephone, and email address, and as a result will not become paid circulators. Both Cole and Weiland testified that the

inability to recruit paid circulators will make it much harder for Plaintiff to obtain the signatures needed to place Medicaid reform on the 2022 ballot.

Plaintiff asserts that having to publicly disclose their names, home addresses, telephone numbers and email addresses makes paid circulators vulnerable to harassment. At the trial of *SD Voice II*, Miller Cannizzaro recounted being aggressively harassed while circulating petitions in Rapid City in 2015 in support of the initiative to establish a state usury limit of 36%. (Doc. 7-7.)

## DISCUSSION

As set forth above, Plaintiff alleges that SB 180's disclosure requirements for paid circulators violates the First Amendment, that SB 180's disqualification of signatures obtained by circulators who make insignificant compliance errors violates the First Amendment, and that SB 180's discrimination against paid circulators violates the First Amendment.

### A. Standing

Defendants dispute Plaintiff's Article III standing to challenge SB 180. "In order to satisfy Article III's standing requirements, [Plaintiff] must have (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct and (3) likely to be redressed by the proposed remedy." *Starr v. Mandanici,*152 F.3d 741, 748–49 (8th Cir. 1998). "The injury must be 'concrete and particularized,' not 'conjectural' or 'hypothetical,' and 'must affect the plaintiff in a personal and individual way.'" *Id.* at 749 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n. 1 (1992)). "In other words, the injury must be beyond that shared in substantially equal measure by all or a large class of citizens." *Id.* (quotation marks and citations omitted)

Here, Defendants claim Plaintiff has not shown the threat of an actual and imminent injury. According to Defendants, because Plaintiff is a ballot question committee and not a paid circulator, it is not harmed by the restrictions it challenges. Defendants argue that Plaintiff's claim that its efforts to collect a sufficient number of signatures may be threatened is a conjectural and hypothetical threat because Plaintiff does not say its efforts to hire paid circulators have been frustrated and has no evidence that its petition signature efforts will fail unless the Court grants relief.

Defendants' arguments miss the mark. Courts have held that restrictions on petition circulation may cause injury to proponents of initiatives by limiting the pool of circulators who carry their message, reducing the size of their audience, making it less likely to gather the number of signatures necessary to place the issue on the ballot, and requiring organizations to allocate

resources elsewhere. *See Meyer v. Grant*, 486 U.S. 414, 422–23 (1988). *Cf. Krislov v. Rednour*, 226 F.3d 851, 857–58 (7th Cir. 2000) (candidates who were denied use of non-registered, non-resident circulators were "required to allocate additional campaign resources to gather signatures and were deprived of the solicitors (political advocates) of their choice. This in itself can be an injury to First Amendment rights") (citing *Meyer,* 486 U.S. at 424).

Plaintiff asserts that the burdens SB 180 place on paid petition circulators limits the pool of people willing to circulate petitions, which restricts Plaintiff's ability to get enough valid signatures to place a constitutional amendment to expand Medicaid on the 2022 ballot. The injury to Plaintiff is concrete and a declaratory judgment that SB 180's requirements are unconstitutional would remove obstacles to obtaining signatures needed to place the amendment on the 2022 ballot, thus redressing Plaintiff's injury. This is adequate to entitle Plaintiff to standing.

## B. Petition Circulation and the First Amendment

All three of Plaintiff's claims for injunctive relief against enforcement of SB 180 allege violations of the First Amendment. The First Amendment, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits state governments from enacting a "law . . . abridging the freedom of speech." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 336, n. 1 (1995). The circulation of initiative and referendum petitions involves "core political speech," and is, therefore, protected by the First Amendment. *See Meyer,* 486 U.S. at 421–22.

The First Amendment does not, however, prohibit all restrictions upon election processes: "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election--and campaign-related disorder." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 191 (1999).

Application of the strict scrutiny standard has not always been required in cases involving the regulation of petition circulation, because " 'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Buckley,* 525 U.S. at 187 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *see also Buckley,* 525 U.S. at 192 (ruling that "no litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon no substitute for the hard judgments that must be made") (internal quotation marks omitted).

To determine whether a ballot-access regulation is unconstitutional, a court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The court must both "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* When First Amendment rights "are subjected to severe restrictions, [a] regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quotation marks omitted). In contrast, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions" on First Amendment rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quotation marks omitted); *see also Timmons*, 520 U.S. at 358–59.

This more flexible approach has been described by the Eighth Circuit:

> While states have "considerable leeway to protect the integrity and reliability of the initiative process," at the same time, the First Amendment requires vigilance "to guard against undue hindrances to political conversations and the exchange of ideas." *Id.* at 191–92, 119 S.Ct. 636. The Supreme Court has developed a sliding standard of review to balance these two interests. Severe burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling state interest, whereas lesser burdens receive a lower level of review. *See Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358–59, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (laying out flexible standard); *But cf. Buckley,* 525 U.S. at 208, 119 S.Ct. 636 (Thomas, J., concurring) (questioning whether serious and lesser burdens can be adequately distinguished).

*Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001).

In *Jaeger,* the Eighth Circuit distinguished North Dakota's prohibition on paying initiative-petition circulators "on a basis related to the number of signatures obtained" from the complete prohibition on paid petition circulators in *Meyer v. Grant.* The Eighth Circuit noted that the state had an "important interest in preventing signature fraud" in the initiative process, and that the state had supported that interest with evidence that paying petition circulators per signature encouraged such fraud. *Id.* at 618. Further, the plaintiffs had "produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures. The [plaintiffs] have only offered bare assertions on this point." *Id.* at 616–617. Thus, because the state asserted an important interest in preventing signature fraud, supported that interest with evidence

that signature fraud was actually a problem in North Dakota, and the plaintiffs failed to present evidence the restriction would otherwise burden their ability to collect signatures, the court upheld the ban on paying petition circulators on the basis of the number of signatures collected. *Id.*

In *Meyer v. Grant,* the plaintiffs challenged an amendment to the Colorado constitution which made it a felony to pay money or anything of value to petition circulators who circulated initiative or referendum petitions. 486 U.S. at 415. After a bench trial, the district court upheld the statute, but the court of appeals reversed. *Id.* at 418–20. The Supreme Court affirmed, explaining:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id.* at 421–22. The Court said that prohibiting paid petition circulators limited "core political speech" in two ways: (1) "it limits the number of voices who will convey [plaintiffs'] message and the hours they can speak and, therefore, limits the size of the audience they can reach"; and (2) "it makes it less likely that [plaintiffs] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 423–24. The Court rejected Colorado's argument that the prohibition was justified by the state's interest in protecting the integrity of the initiative process because Colorado presented no evidence that paid petition circulators are more likely to accept fraudulent signatures over those of a volunteer, and also because other Colorado statutes prohibited accepting forged or fraudulent signatures. *Id.* at 426–27. The Court concluded the prohibition "imposes a burden on political expression that the State has failed to justify," and thus the prohibition violated the First Amendment. *Id.* at 428.

In *Buckley,* the Supreme Court's task was to determine whether another Colorado statute regulating petition circulators violated the First Amendment. The Colorado statute required: (1) petition circulators be registered voters in Colorado; (2) petition circulators wear an identification

badge bearing the circulator's name; and (3) initiative proponents publicly disclose the names and amounts paid to all paid circulators. *Buckley*, 525 U.S. at 186.

The Court ruled that the registered voter requirement "decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators. Both provisions limit the number of voices who will convey the initiative proponents' message and, consequently, cut down the size of the audience proponents can reach." *Id.* at 194–95 (internal quotation marks and alterations omitted). The Court rejected Colorado's assertion that the registered voter requirement was not a severe burden because it was not difficult to register to vote and noted that the decision not to register can also implicate "political thought and expression." *Id.* at 195–96.

The Court also struck down the name badge requirement for the petition circulator "because the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest." *Id.* at 199. The plaintiffs presented evidence that compelling circulators to wear name badges inhibited participation in the petitioning process by limiting the number of people willing to work. *See id.* at 198. One witness told of harassment he experienced circulating a hemp initiative petition. *Id.* Other petition advocates reported that potential circulators were unwilling to wear personal identification badges. *Id.* The Court rejected Colorado's argument that the name badge "enables the public to identify, and the State to apprehend, petition circulators who engage in misconduct." *Id.* at 198. The affidavit requirement that each petition section contain, along with the collected signatures of voters, the circulator's name, address, and signature, "renders less needful the State's provision for personal names on identification badges." *Id.*

Finally, the Court struck down the disclosure provisions compelling the proponent of the initiative to provide monthly disclosure of the name and addresses (residential and business) of each paid circulator, and the amount of money paid and owed to each circulator. The Court explained that the provision, like the name badge requirement, forced circulators to surrender the anonymity enjoyed by their volunteer counterparts and had only a tenuous relationship to Colorado's interest in ensuring the integrity of the initiative process. *Id.* at 203–04. The Court noted that disclosure of the names of "initiative sponsors, and the amounts they have spent gathering support of their initiatives," responds to the state's interest in disclosure "as a control or check on domination of the initiative process by affluent special interest groups." *Id.* at 202–03.

Though the Court struck down Colorado's requirement of the disclosure of the names and addresses of paid circulators, and the amounts paid to them, it approved of a requirement that all circulators, paid and volunteer, had to complete an affidavit that mandated disclosure of their names and addresses when they submitted the signed petitions at the end of the circulation period. *See id.* at 198–99. The affidavit requirement at issue in *Buckley* is very similar to that required by SDCL § 2-1-10, which Plaintiff in the present case does not challenge. The district court in *Buckley* explained the differences between requiring the names and addresses of circulators when they turn in the signed petitions, and the earlier disclosures of names and addresses in the monthly reports and on badges worn on the street.

> The requirement that the attesting circulator include his or her name and residential address raises the same concerns as the monthly reports by the proponents and to some extent the identification badge requirement. The difference is that the affidavit requirement has the primary purpose of providing the opportunity for an adequate hearing on the sufficiency of the signatures for the petition and for other matters relevant to placing the measure on the ballot. Here, then, the identification must be considered in terms of the state's power to regulate ballot access. There is a compelling necessity to be able to summon circulators to provide testimony at a hearing on challenges to the validity of the signatures and for other matters relevant to the petitioning process.
>
> There is a qualitative difference between requiring name and residence identification on an affidavit for the sections of the petition circulated by the identified individual and the inclusion of his or her name and address in monthly reports or on badges displayed on the street. That difference is a matter of access. Those who may seek this identifying information for such purposes as retaliation or harassment will have considerably greater difficulty in finding these names and addresses in the masses of papers filed with the petitions as compared with the monthly reports and the identification badges. Even assuming a strict scrutiny standard, the court finds that the state's compelling need for the names and addresses of the circulators is justified and this requirement is sufficiently narrowly drawn to be constitutional.

*Am. Const. L. Found., Inc. v. Meyer*, 870 F. Supp. 995, 1004 (D. Colo. 1994), *aff'd in part, rev'd in part,* 120 F.3d 1092 (10th Cir. 1997), *aff'd sub nom. Buckley*, 525 U.S. 182 (1999).

The Supreme Court determined that even though the affidavit requirement "reveal[ed] the names of the petition circulator and is a public record," it was "separated from the moment the circulator speaks," and it "must be met only after circulators have completed their conversations with electors." *Buckley*, 525 U.S. at 198, 200.

In its Proposed Findings of Fact and Conclusions of Law, Plaintiff in the present case describes SB 180 as a "disclosure law" that is to be reviewed with "exacting scrutiny."[1] (Doc. 26, pp. 30, 34.) Defendants agree. (Doc. 28, pp. 31, 37.)

In support of its argument that exacting scrutiny rather than strict scrutiny applies to all of Plaintiff's claims, the State cites *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010). There, the Supreme Court applied strict scrutiny to a federal ban on corporate electioneering communications, 558 U.S. at 340, and what it termed "exacting scrutiny" to the law's attending disclosure provisions. *Id.* at 366–67. The State also cites *Doe v. Reed*, 561 U.S. 186, 196 (2010) (exacting scrutiny in the compelled disclosure context " 'requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest' ") (quoting *Citizens United*, 558 U.S. at 366–67).

The Eighth Circuit has described exacting scrutiny as requiring the State to "show, at a minimum, that the law has a 'substantial relationship' to a 'sufficiently important governmental interest.' " *Calzone v. Summers*, 942 F.3d 415, 423 (8th Cir. 2019) (en banc). In *Calzone*, the plaintiff asserted a violation of his First Amendment rights to free speech and to petition the government. *Id.* at 420. The plaintiff frequently talked to Missouri legislators about political issues that he found important. *Id.* at 418. He was not paid to visit with the legislators and he did not spend money for the benefit of public officials. *Id.* Nevertheless, the state of Missouri determined the plaintiff was required to register as a legislative lobbyist under its lobbying law, and this law required the plaintiff, among other things, to reveal his identity and divulge his activities. *Id.* at 423. The Eighth Circuit described the state's purported interests in this requirement:

> Missouri's asserted justification is "transparency," even though what it means by that is less than clear. Transparency seems to encompass two ideas. The first is an interest in sharing information about advocacy activities in order to prevent actual or apparent public corruption. The second is a general interest in having the world know who is trying to influence the work of the General Assembly.

---

[1] Plaintiff argues that strict scrutiny applies to its third cause of action alleging that SB 180's overt discrimination against paid circulators violates the First Amendment because it is not a disclosure law but rather is a discriminatory burden on money-enabled speech. (Doc. 26, pp. 41-42.)

*Id.* The Court held that Missouri failed to establish "that applying the law to [the plaintiff], who neither spends nor receives money in connection with his advocacy, bears a substantial relationship to its anti-corruption interest." *Id.* at 424.

It is of interest to this Court that the Eighth Circuit in *Calzone* believed some authority supported applying strict scrutiny to the law requiring the public disclosure of lobbying activities, but it declined to decide which standard governed because the law as applied to the plaintiff failed exacting scrutiny.[2] *See* 942 F.3d at 423 n.6.

With this precedent in mind, the Court will proceed with its analysis of Plaintiff's motion for a preliminary injunction.

### C.  Motion For Preliminary Injunction

Rule 65(a) of the Federal Rules of Civil Procedure governs entry of a preliminary injunction. The proper analysis of the preliminary injunction motion in this case is found in *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc) (reaffirming "that a party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a 'fair chance' that it will succeed on the merits. We characterize this more rigorous standard . . . as requiring a showing that the movant 'is likely to prevail on the merits.' "). That case requires the Court to examine first the likelihood that Plaintiff will prevail on the merits of its claims before the Court applies the remaining three factors of a preliminary injunction analysis: (1) the threat of irreparable harm or injury to the movant absent the injunction, (2) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (3) the public interest. *Dataphase Sys,. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). As the moving party, Plaintiff bears the burden of proving all of these factors. *CDI Energy Servs. v. West River Pumps. Inc.*. 567 F.3d 398, 402 (8th Cir. 2009) (citation omitted).

1.  **Likelihood of Success on the Merits of First Cause of Action: Allegation that SB 180's disclosure requirements for paid petition circulators violate the First Amendment**

---

[2] Strict scrutiny would have required Missouri "to prove that the law furthers a compelling interest and that it is narrowly tailored to achieve that interest." *Calzone*, 942 F.3d at 423 n.6.  (internal quotation and citations omitted).

Following the precedent set forth above, the Court first will consider and define the burdens imposed by SB 180, and then it will weigh the burdens against the state's regulatory interests. The degree of the burden determines the extent SB 180 must advance the state's interest.

The Defendants agree that SB 180 imposes the following burdens on paid circulators: 1) prior to circulating petitions, paid circulators must fill out a form disclosing their name, home address, phone number, and email address to the Secretary of State; 2) the information submitted to the Secretary of State by paid circulators is available to anyone who requests it from the Secretary of State by email, telephone or letter (the information is not available on the website); 3) paid circulators must update their information within seven days if it changes; and 4) paid circulators must wear a badge indicating their status as a paid circulator but not otherwise personally identifying them. (Doc. 29, p. 13.)

Plaintiff asserts additional burdens result from SB 180: requiring paid circulators to comply with SB 180 would subject them to threats or harassment, discourage them from acting as paid circulators, and impair Plaintiff's ability to succeed in gathering about 65,000 signatures by November 8, 2021, in order to place its proposed constitutional amendment on the ballot.

Any restriction on petition circulators obviously has a negative effect on the number of voices available to circulate petitions, but Plaintiff's evidence of the burdens SB 180 imposes upon it is not strong. There is no evidence that Plaintiff tried to hire another paid circulator but was unable to do so because of SB 180's disclosure requirements. The sole paid circulator for Plaintiff, Pam Cole, willingly disclosed her personal information to the Secretary of State. However, it is her opinion that many potential paid circulators who are not as committed as she is will be unwilling to disclose their personal information and thus will not work as paid circulators. Miller Cannizzaro testified at the trial of *SD Voice v. Noem* that he was harassed while circulating petitions in Rapid City in 2015 in support of the initiative to establish a state usury limit of 36%, and Plaintiff submitted his testimony in this case. (Doc. 7-7.) This establishes that petition circulators in general may be subject to harassment, but the disclosure requirements of SB 180 did not exist when Mr. Cannizzaro was harassed in 2015. Without a motion for summary judgment or a trial to generate evidence for this Court's consideration, it is difficult to determine the extent to which SB 180 burdens the First Amendment rights of Plaintiff. The constitutional analysis in cases involving restrictions on petition circulators is fact-intensive. For example, in *Bernbeck v. Moore*, 126 F.3d 1114, 1116–17 (8th Cir. 1997), the plaintiffs presented evidence at a bench trial

that the number of circulators petition organizers could find "was grossly insufficient to the task," and on appeal the Eighth Circuit concluded that Nebraska's law "requiring petition circulators to be registered voters in Nebraska violates the First Amendment because it restricts core political speech and the statutory requirement is not the least restrictive means available for satisfying Nebraska's interests in preventing signature fraud and maintaining the integrity of its initiative process."[3] *Id.* at 1117. In the present case, Plaintiff did not present any specific evidence that SB 180 is preventing it from finding a sufficient number of circulators. Plaintiff has provided no evidence that shows a likelihood of harassment in response to circulating petitions in favor of Medicaid reform. Plaintiff has provided no evidence that Medicaid reform would be likely to precipitate threats, harassment, or reprisals against petition circulators.

The Court turns next to the State's justification for the disclosure requirements on paid circulators in SB 180. The State claims the disclosure requirements provide transparency to the public about who is circulating petitions, and that public disclosure is needed because the Secretary of State's verification process will not catch all invalid signatures. In addition, the State asserts that public disclosure allows the petition signers to help combat fraud because the signer is in the best position to detect forgery and "bait and switch" fraud in which the underlying nature of the petition is misrepresented to the signer. (Doc. 29, p. 14.)

The State's evidence of its interests comes in two forms. The first is related to Initiated Measure 26 that was litigated in *Johnson v. Krebs* during the 2018 election season. According to the State:

> In *Johnson et al., v. Krebs*, 32CIV18-103 (SD 2018), the petitioners in that case sought to invalidate signatures for Initiated Measure 26 ("IM 26") on the following grounds: petition circulators falsely swore to their residence address or were not South Dakota residents; voter signatures were duplicated; signatures were submitted under wrong petitions; signatures were illegible; signers were not registered voters; and signatures were not otherwise in compliance with South Dakota law. (Hansen Aff. ¶¶ 3, 4, 9, and 10.) Evidence in the mandamus proceedings showed that some of the signatures were circulated by a "team" of non-resident professional circulators and a resident witness. (Hansen Aff. ¶ 5.) The petition also alleged that paid circulators were compensated in a manner that violated South Dakota law and that circulators failed to properly disclose the amount of compensation. (*Id.* at ¶ 4). While both paid circulators and volunteers circulated petitions for IM 26, one thing is clear—it was the actions surrounding paid circulators that resulted in the challenges to the ballot measure. (*Id.* ¶¶ 3-10.) The challenge to IM 26 offered evidence of compromised election integrity as well as threats to the transparency and

---

[3] It is notable that the Eighth Circuit applied strict scrutiny when it struck down the voter-registration requirement for circulators in *Bernbeck*, 126 F.3d at 1116.

accountability of the ballot measure process. (*Id.* ¶¶ 2-10.) Ultimately, the court in *Johnson* issued a writ prohibiting the Secretary of State from placing IM 26 on the ballot because many of the signatures obtained by the paid petition circulators were invalid due to noncompliance with South Dakota law. (*Id.* ¶ 9, Ex. A.)

(Doc. 14, p. 15.)

     The second form of the State's evidence of its interest in combating the appearance of corruption and creating transparency is the four ballot measures that failed the Secretary of State's statutory review process and so were not placed on the ballot in 2018.  According to the State:

> IM 26 was not the only ballot measure barred from placement on the 2018 general election ballot based on invalidated signatures. Four ballot measures, a significant increase, did not qualify due to invalidated signatures. (Barnett Aff. ¶¶ 10-12.) This increase was concerning compared to the 2016 electoral season, which had only one ballot measure disqualified for invalidated signatures, and the 2014 electoral season, which had zero ballot measures disqualified for invalidated signatures. (*Id.*) This change—coupled with the successful court challenge to IM 26—created an appearance of corruption and a need for transparency in South Dakota's process for circulating petitions. (Hansen Aff. ¶¶ 3, 12, 13.) As the Supreme Court has recognized, the government has a sufficiently important governmental interest in "pressing electoral integrity" caused not only by fraud, but also by mistake. *John Doe No. 1*, 561 U.S. at 198. "That interest also extends to promoting transparency and accountability in the electoral process . . ." (*Id.*) SB 180 seeks to address that by making information surrounding paid circulators open and available to the public during the entire time signatures are being gathered. In fact, there were no ballot measures in 2020 that were disqualified from the general election ballot based on invalidated signatures. (Barnett Aff. ¶ 13.)

(Doc. 14, pp. 15-16.)

     Assuming that exacting scrutiny applies to this claim, that means the State has the burden to demonstrate that the circulator disclosure requirements are substantially related to a sufficiently important governmental interest.   The brief submitted by the State makes it clear that the aim of the State is to prevent corruption and protect the integrity of the ballot initiative process.  The State asserts that the Legislature enacted SB 180 because the 2018 election season raised significant concerns about the appearance of corruption and compromised election integrity caused by paid circulators. (Doc. 14, pp. 14-26.)  The State distinguishes *Buckley* because the name badges worn by circulators disclosed their personal information at the exact time they are circulating the petitions while, under SB 180, the disclosure to the public is before or after circulation.  The State addresses *Buckley's* holding that the monthly disclosure of the names and addresses of each paid circulator in monthly reports made during the circulation process was unconstitutional because it

forced circulators to surrender the anonymity enjoyed by their volunteer counterparts and had only a tenuous relationship to Colorado's interest in ensuring the integrity of the initiation process. The State argues that, in contrast to Colorado, it has demonstrated a need for disclosure of the personal information of paid circulators prior to and during circulation due to the invalidation of signatures leading to disqualifying IM 26 and three other ballot measures from appearing on the 2018 general election ballot. But the concerns raised by identifying the circulators' names and addresses in the sponsors' monthly reports in *Buckley* are identical to the effect of the disclosure requirements of SB 180. In both instances, the injury to speech is heightened for the petition circulator because the requirements compel disclosure of personal identification information. In this case, SB 180 requires disclosure of even more information than in the monthly reports in *Buckley*. In addition to name and address, paid circulators in South Dakota must disclose phone numbers, email addresses, state of issuance for driver license or other i.d., state of voter registration, and whether the paid circulator is a registered sex offender. *Buckley* made clear that disclosure of paid circulator information is just as problematic when they are made before the petitions are circulated as when they are made (by name badges) to the signer at the exact time that the petition is circulated. The circulator's interest in anonymity is also great before the petition is circulated. SB 180 requires release of all of the personal information regarding paid circulators to anyone who requests it from the Secretary of State. If someone decided to harass a petition circulator, it would be easy to find their personal information, and the harassment could take place at any time and even via email or phone, or at the circulator's home. In other words, intimidation of paid circulators could occur even when the circulator is not working at obtaining signatures. The Supreme Court in *Buckley* upheld the affidavit requirements that disclosed circulators' names and addresses specifically because it "must be met only after circulators have completed their conversations with electors." 525 U.S. at 200. It struck down the requirement that the paid circulators' information be released before the petitions were circulated.

The same reasoning applies to SB 180's requirement making the personal information of paid circulators available to anyone who requests it from the Secretary of State, and that requirement must be struck down as unconstitutional because the State's evidence is not enough to demonstrate a substantial need to disclose personal information of paid circulators, which burdens core political speech.

Relying on *Citizens United*, the State argues that petition circulators are acting as legislators, and their right to anonymity is not outweighed by the State's interest in promoting election integrity and rooting out fraud.   (Doc. 14, p. 21.)   The Court is not convinced.[4]   Though petition circulation involves core political speech, the job of the petition circulator is to obtain signatures, not to make or vote on laws.   At the petition circulation stage, it is the official proponent who is acting as a legislator.   The circulators are the tools that the proponent of the law uses to get enough voters to sign and put the initiative or constitutional amendment on the ballot.   Disclosure of the name of the proponent of an initiative or constitutional amendment submitted to voters serves important State interests in electoral integrity, but it is not shown to the Court how disclosure of the names of the paid petition circulators does so.   Any benefit to voters from disclosure of information will come from identifying the sponsors and financial backers of the initiative or constitutional amendment, not the circulator's private information.

The State also relies heavily on *Doe v. Reed*, 561 U.S. 186 (2010), for the proposition that the act of soliciting signatures occurs in public and therefore the petition circulators' right to anonymity is outweighed by the State's interest in promoting election integrity and rooting out fraud.   *Doe* considered the constitutionality of a law requiring the disclosure of the identities of petition signatories, not petition circulators.   561 U.S. at 190–95.   The Court applied exacting scrutiny and upheld the law.   *Id.* at 197–202.   However, a signatory plays a far different role from that of a petition circulator and does not engage in communication with other voters.   Registered voters are the ones vested with the power implicated by the initiative process, including the right to apply for, sign petitions, and vote on initiative measures.   "South Dakota citizens may enact laws

---

[4] *Citizens United* involved a challenge to a requirement that political advertisements must state who "is responsible for the content of [certain] advertising." 558 U.S. at 366.  The Supreme Court recognized the informational interest in disclosures of contributions designed to influence elections and in disclaimers stating the name of the person or group funding the advertisement. *See id.* at 371 (transparency regarding who is making corporate speech "enables the electorate to make informed decisions and give proper weight to different speakers and messages"). In *Citizens United*, the plaintiff disputed that an informational interest justified the disclaimer and disclosure provisions because it merely sought to air an advertisement that referred to then-Senator Clinton by name to promote the movie *Hillary*. *See id.* at 367-68. Although the Supreme Court concluded the ads fell within the federal definition of an "electioneering communication," it rejected the contention that disclosure requirements for independent expenditures should be limited to express advocacy and its functional equivalent. *Id.* at 368-69. Instead, even though the ads "only pertain to a commercial transaction," the Supreme Court concluded "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 369. The Supreme Court's reasoning in upholding the electioneering communications rules does not apply to the circumstances here.  Plaintiff in this case is not hiding from the voting public that it is the proponent of the Medicaid reform constitutional amendment. The public knows who is behind the proposed amendment.

directly through ballot measures." *SD Voice v. Noem*, 987 F.3d at 1188 (citing S.D. Const. art. 3, § 1).[5] "Before being placed on the ballot, a measure must garner support from a sufficient number of electors, which is generally achieved by circulating ballot petitions for signatures." *Id.* (citing SDCL § 2-1-1.)   In other words, ballot measures allow voters to petition to propose statutes or constitutional amendments to be adopted or rejected by the voters at the polls, making the voters similar to a legislative body. *See, e.g., Bernstein Bros. Inc. v. Dept. of Revenue*, 661 P.2d 537, 539 (Or. 1983) ("The creation of the referendum power (along with initiative power) changes the allocation of legislative power within a state, because after this creation the legislative power is shared between the people and their representatives.")   Thus, the State's interest in disclosing names of signatories (voters) is stronger than its interest in disclosing the identity (and other personal information) of ordinary petition circulators who are mere advocates for signing a petition.   The Court concludes that there is a different balance between the interests of the speaker in this case (the petition circulator) and the State when compared to the speakers in *Citizens United* (the promoters or sponsors of the bill) and *John Doe* (the voters and signatories).

    This case is more akin to the Ninth Circuit's decision in *(WIN) Washington Initiatives Now v. Rippie*, 213 F.3d 1132 (9th Cir. 2000). WIN challenged a Washington law that compelled the disclosure of petition circulators' identities, addresses, and compensation before and after an election. *WIN*, 213 F.3d at 1134–35. These disclosures were "routinely filed during the circulation period," which the Ninth Circuit concluded created a chilling effect on speech. *Id.* at 1138–39. Applying exacting scrutiny, the Court struck down the disclosure requirement. *Id.* at 1140.   The Court said "it is precisely the risk that people will refrain from advocating controversial positions that makes a disclosure scheme of this kind especially pernicious. Even when it does not have the effect of facilitating harassment, the disclosure requirement chills speech by inclining individuals toward silence." *Id.* at 1138. The Ninth Circuit held that the "interest in educating voters through

---

[5] Article III, § 1 of the South Dakota Constitution establishes the people's right of initiative and referendum. It provides, in relevant part:

> The legislative power of the state shall be vested in a Legislature which shall consist of a senate and house of representatives. However, the people expressly reserve to themselves the right to propose measures, which shall be submitted to a vote of the electors of the state, and also the right to require that any laws which the Legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions. Not more than five percent of the qualified electors of the state shall be required to invoke either the initiative or the referendum.

campaign finance disclosure is more adequately served by a panoply of the State's other requirements that have not been challenged." *Id.* at 1139.

This Court agrees that the State has an important regulatory interest in preventing fraud and its appearances in its electoral processes. But the record does not support the conclusion that SB 180's public disclosure requirements combat actual instances of fraud or forgery committed by petition circulators in the signature gathering process. As stated by the Ninth Circuit, "[a]lthough Washington has expressed its interest in full disclosure as a means to educate voters and promote confidence in government, there is no logical explanation of how a voter who signs an initiative petition would be educated in any meaningful way by learning the circulator's name or address; nor how that disclosure would assist a voter in judging the credibility of individual petition circulators." *WIN*, 213 F.3d at 1139. Applying the exacting scrutiny standard, the Court concludes that the disclosure of petition circulators' private information unnecessarily burdens free speech and that it is not substantially related to the State's interest in promoting election integrity and rooting out fraud. Less intrusive alternatives are available to further the State's interests in preventing corruption and protecting the integrity of the ballot initiative process, and public disclosure of petition circulators' private information cannot survive exacting scrutiny. Therefore, Plaintiff is likely to succeed on the merits of its constitutional challenge to the public disclosure requirements in SDCL § § 2-1-1.6.

   2. **Likelihood of Success on the Merits of Second Cause of Action: Allegation that SB 180's disqualification of all signatures obtained due to insignificant compliance errors violates the First Amendment**

Plaintiff's second challenge is that SB 180's disqualification of all registered voters' signatures obtained due to insignificant compliance errors violates the First Amendment. Specifically, the statute requiring a paid circulator to submit an application to the Secretary of State "prior to circulation of any petition" provides, in part:

> If a paid circulator fails to file the registration required by this section before circulating a petition, or if the registration is incomplete, or if any statement included in the paid circulator's certification is determined to be false, any signatures collected by the paid circulator are void and may not be counted. Petition sponsors shall provide a list to the secretary of state of any person acting as a paid circulator for the sponsor's ballot measure and the rate of compensation.

SDCL § 2-1-1.5. Plaintiff argues that it violates the First Amendment to void every citizen's signature if the circulator who collected it makes an innocent, immaterial error in any information that the circulator is required to submit under this statute.

Plaintiff also contends that SB 180's requirement that paid petition circulators update their information with the Secretary of State within seven days of any changes creates "an unconstitutional trap for both wary and unwary petition circulators and signers. It infringes on the petition signers' First Amendment right to endorse political change, in the form of their signatures, and not to have their endorsement disregarded for a reason that bears no relation to any legitimate government interest." (Doc. 26, p. 38.)

Plaintiff points out that the state's interest in integrity of the initiative process is already protected by SDCL § 2-1-10, which requires each petition circulator to sign a verification - - after collecting signatures - -

> attesting that the circulator personally circulated the petition and is not attesting to any signature obtained by any other person, that the petition circulator is a resident of South Dakota, that the circulator made reasonable inquiry and, to the best of the circulator's knowledge, each person signing the petition is a qualified voter of the state in the county indicated on the signature line and that no state statute regarding the circulation of petitions was knowingly violated.

SDCL § 2-1-10. In addition, SDCL § 2-1-10 requires that "[t]he circulator's signature on the verification shall be witnessed and notarized by a notary public commissioned in South Dakota or other officer authorized to administer oaths pursuant to § 18-3-1," and "[a]ny person who falsely attests to the verification under this section is guilty of a Class 1 misdemeanor." *Id.* According to Plaintiff, these and other potential criminal penalties "sufficiently safeguard the ballot circulation process from abuse." (Doc. 26, p. 39.) Plaintiff cites as an example the case of *State v. Bosworth*, 899 N.W.2d 691 (S.D. 2017), where the South Dakota Supreme Court affirmed a political candidate's conviction of six felony counts of offering a false or forged instrument. The defendant signed a sworn certification that she personally circulated six petitions, but an investigation revealed that she was not the circulator.

In response, the State claims that the results of the 2018 election season made it clear that the previous laws in place were insufficient to deal with the spike in ballot measures that did not qualify on the basis of invalidated signatures. It states that though SB 180 provides that signatures

gathered by a circulator who did not comply with South Dakota law are void, the Secretary of State's authority to invalidate signatures is restricted by SDCL § 2-1-17.1 and SDCL § 2-1-18. It explains the rationale behind the seven-day updating requirement:

> The seven-day updating requirement furthers the State's sufficiently important governmental interests in promoting election integrity and transparency, addressing fraud and the appearance of corruption, and ferreting out invalid signatures. *John Doe No. 1*, 561 U.S. at 198. By requiring continuing obligations to update information, the public can continue to monitor and "can help cure the inadequacies of the verification and canvassing process." *Id.* In fact, by making this information available to the public up front, as opposed to after signatures are gathered, the public can monitor that circulators are complying with the disclosure requirements throughout the canvassing process. If there is an error with a circulator's information, the public can catch this issue early on before the deadline for petition circulators, which may provide the paid circulator an opportunity to correct the information, and if necessary, to regather the signatures. When paid circulators could not be located to verify signatures for IM 26, the deadline had passed and the measure was prohibited from being placed on the general ballot. (Hansen Aff. at Ex. A); *Johnson, et al.*, 32CIV18-103 (Sixth Jud. Cir. 2018)).

(Doc. 28, pp. 40-41.)

Furthermore, the State interprets SB 180 in such a way that the section providing that signatures are void for noncompliance by the circulator does not apply to the updating requirement:

> SB 180 does not state that signatures are void for failure to comply with the seven-day updating requirement. Rather, SDCL § 2-1-1.5 provides that signatures are void if a paid circulator does not file an application before collecting signatures, if the registration is incomplete, or if any part of the certification is determined to be false. *After* this requirement discussing voiding of signatures, the statute then goes on to say that the information shall be updated no more than seven days after a change. The statute does not say signatures are void for failure to update information.

(Doc. 28, p. 40) (emphasis in the original). The State might not subsequently consider itself bound by its current interpretation. In addition, the State goes on to say that it is not against the First Amendment to void a signature that does not comply with the law, "even on the basis of an 'innocent' error." (Doc. 28, p. 39.)

The State's evidence of its interest in ferreting out and voiding invalid signatures on a ballot is in the form of the Affidavit of Jonathon Hansen where he describes filing a mandamus action in Hughes County circuit court to challenge to validity of over 700 signatures submitted in support

of Initiated Measure 26.[6]  (Doc. 17.)  His law firm and the private investigators that they hired were unable to locate some of the paid petition circulators who had gathered the challenged signatures.  The circuit court's Order in the mandamus proceeding shows that it found 10 sample signatures invalid due to the circulator failing to personally witness the signing, 69 sample signatures invalid due to the omission of two circulators' verifications, and 33 sample signatures invalid due to the omission of the circulator's residence address. (Doc. 17-1.) The Order does not indicate whether the circulators were paid or volunteers.  The Court is not aware of who or what entity, and the location of the same, paid for Attorney Hansen's private investigators.

As explained above, limits on paid petition circulators violate the First Amendment by limiting the political speech of initiative circulators and proponents and lessening the chances that the proponents will garner sufficient signatures to place the matter on the ballot. *Meyer v. Grant*, 486 U.S. at 422-23.  To restrict core political speech, the State must demonstrate a substantial need.  The only evidence the State has of its need for restrictions on paid circulators is the one mandamus proceeding initiated by Representative Hansen in his separate capacity as a lawyer. Though the circuit court's Order shows that two circulators did not file a proper verification, one left out his residence address, and two circulators failed to personally witness 10 signatures, that is not evidence that paid petition circulators in South Dakota have engaged in wide-spread and significant instances of fraud that would justify restricting their speech in the manner it is restricted by the burdens imposed by SB 180.[7]  Specifically, there is no showing that the State needs to verify and have updated paid circulators' information throughout the canvassing process because at that point they do not even have the petition with the signatures that they need to verify.  In addition, the inability to locate paid circulators if they are needed to verify signatures could be remedied by requiring them to submit addresses and phone numbers when their petitions are completed, submitted and verified pursuant to SDCL § 2-1-10.  As the Eighth Circuit noted in *Bernbeck v.*

---

[6] The State also points to Steve Barnett's averment that there were four ballot measures in 2018 that did not qualify for the general election ballot based on invalidated signatures, but there is no explanation or evidence as to why the signatures were invalidated.

[7] Mr. Hansen, in his capacity as a legislative Representative and a lawyer representing the Applicants, avers that he also alleged in the mandamus action that circulators failed to properly disclose the amount of their compensation and that some out-of-state circulators "partnered with one or more resident petition circulators" in violation of South Dakota law requiring circulators to be South Dakota residents, but that was not mentioned in the circuit court's Order as a reason for invalidating signatures.

*Moore*, the risk of fraud is minimized at the at the time of filing the petition. In *Bernbeck*, Nebraska law required that "every circulator must sign an affidavit under oath at the bottom of each sheet of a petition attesting that he or she witnessed each signature, that the date of each signature is correct and that the circulator believes each signer was qualified to sign the petition." 126 F.3d at 1116. The Eighth Circuit noted that

> [t]hese same devices for preventing signature fraud were found to be "adequate to the task of minimizing the risk of improper conduct in the circulation of a petition" in *Meyer*, "especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." 486 U.S. at 427, 108 S.Ct. at 1895. The State of Nebraska similarly has an adequate arsenal of safeguards to protect against the danger of signature fraud, and accordingly, we conclude that the requirement of voter registration is not narrowly tailored to serve the State's compelling interest.

*Bernbeck*, 126 F.3d at 1117. South Dakota also has avenues to ensure against fraud in the petition circulating process that are less burdensome on First Amendment rights of paid circulators.

In the present case, the Court concludes that the SB 180's "up front" certification and seven-day updating requirements are not substantially related to the State's interest in ferreting out invalid signatures. In fact, the "up front" certification and seven-day updating requirement disadvantage registered voters whose signatures will be more likely to be invalidated, disadvantage proponents who will be under more pressure to collect more signatures, and disadvantage paid circulators who bear the brunt of the updating burden, and face the risk of harassment and violation of their First Amendment right to free speech. As stated earlier, South Dakota has embraced the right of its citizens to enact laws directly through ballot measures. "Before being placed on the ballot, a measure must garner support from a sufficient number of electors, which is generally achieved by circulating ballot petitions for signatures." *SD Voice v. Noem*, 987 F.3d at 1188. The State's interest in regulating the process does not outweigh the risks that SB 180's requirements will result in invalidation of signatures from registered voters who want the constitutional amendment to allow Medicaid to be available to the poor placed on the 2022 ballot.[8]

---

[8] Furthermore, SB 180's broad language that any signatures collected by the paid circulator are void and may not be counted "[i]f a paid circulator fails to file the registration required by this section before circulating a petition, or if the registration is incomplete, or if any statement included in the paid circulator's certification is determined to be false," leaves more questions than answers.  The paid circulator is required to "certify the circulator's name, that the circulator is at least eighteen years of age, physical address of current residence, physical address of prior

The Court concludes that requiring the certification "up front," and continuing to update the information within seven days any time it changes throughout the canvassing process, are not substantially related to the State's interest in its ability to locate paid circulators to verify signatures. Applying exacting scrutiny, the Court concludes that SB 180's requirements for pre-certification of paid circulators and seven-day updating of the information unnecessarily burdens free speech, and they are not substantially related to the State's interests. Thus, Plaintiff is likely to succeed on the merits of its constitutional challenge to these requirements found in SDCL § 2-1-1.5.

### 3. Likelihood of Success on the Merits of Third Cause of Action: Allegation that SB 180's overt discrimination against paid circulators violates the First Amendment

These same reasons support a conclusion that Plaintiff is likely to succeed on its third allegation that SB 180's discrimination against paid circulators violates the First Amendment. The State has not shown that paid petition circulators create a greater risk of fraud than volunteers. The Supreme Court rejected that argument in *Meyer v. Grant*:

> It cannot be assumed that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer motivated entirely by an interest in having the proposition placed on the ballot.

*Meyer*, 486 U.S. at 415. If the State's interest is, at it says, to ferret out invalid signatures, it makes no sense to limit its regulations to paid circulators and not apply them as well to unpaid circulators. For these reasons, Plaintiff is likely to prevail on its allegation that applying the regulations to core political speech of the paid circulators - - the very people that Pam Cole and Rick Weiland aver

---

residence if current residence is less than one year, email address, phone number, state of issuance for driver license or other government-issued identification, state of voter registration, the name of the petition sponsor, and whether the paid circulator is a registered sex offender. SDCL § 2-1-1.5. What if a paid circulator makes a typo in their address or phone number, or inadvertently leaves out their email address? In other words, what are the grounds for finding the certification incomplete or false? And who makes those determinations? Apparently, any "innocent" error is enough. (Doc. 28, p. 39, State's Objections to Plaintiff's Proposed Findings of Fact and Conclusions of Law.)

are necessary to gather the number of signatures need to get the constitutional amendment on the ballot - - violates the First Amendment.[9]

### 4. Remaining Preliminary Injunction Factors

For the same reasons that render Plaintiff's success likely on the merits of its constitutional challenges to the requirements in SB 180, Plaintiff has also shown it will suffer irreparable harm in the absence of relief. Pam Cole and Rick Weiland aver that SB 180 impairs Plaintiff's ability to hire paid circulators to work on getting enough signatures to place the constitutional amendment to reform Medicaid on the 2022 ballot. And Plaintiff would not be able to sue Defendants for monetary damages, so any injury to Plaintiff is irreparable. *See Gen. Motors Corp. v. Harry Brown's. LLC.* 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."). In turn, the balance of harms and public interest factors favor Plaintiff. The balance of harms factor requires this Court to weigh the severity of the impact on the State should the injunction be granted against the hardship to Plaintiff should the injunction be denied. *See PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1145 (8th Cir. 2007). On one hand, the public has an interest in the regulation of constitutional amendment and statutory petitions and in protecting the integrity of the process. Those interests are currently well-protected. As compared to the new restrictions in SB 180, the public has a greater interest in protecting the First Amendment right to freedom of speech.[10] The requirements of SB 180 burden Plaintiff's First Amendment rights and will continue to do so absent a preliminary injunction.

---

[9] This Court need not decide what standard of review applies because the regulations on paid circulators fail even exacting scrutiny. The State has not shown that tighter restrictions on paid circulators have a substantial relationship to a sufficiently important governmental interest.

[10] The initiative and referendum process is a matter of significant public interest and use in South Dakota. Interest is demonstrated by a late April, 2021 poll conducted by South Dakota News Watch and the Chiesman Center for Democracy at the University of South Dakota. "In the telephone poll of 500 South Dakota residents from across the state, 74.8% of respondents said they agreed or strongly agreed that 'citizen ballot initiatives are an important part of the democratic process.' " Bart Pfankuch, Poll Part 3: South Dakotans support ballot initiative process and oppose lawmaker interference, SOUTH DAKOTA NEWS WATCH (May 26, 2021), https://www.sdnewswatch.org/stories/poll-part-3-south-dakotans-support-citizen-led-initiative-process-and-oppose-lawmaker-interference/. This information was not used for this Opinion, but it is worth repeating on this issue of significant public interest.

**CONCLUSION**

The Court finds that the State did not meet its burden of showing that the burdensome requirements of SB 180 challenged by Plaintiff as violating the First Amendment are substantially related to the State's interests in election integrity and avoiding fraud. The Court grants Plaintiff's Motion for Preliminary Injunction (Doc. 4). Accordingly,

**IT IS ORDERED** that the Secretary of State is preliminarily enjoined from enforcing the requirements of SB 180.

Dated this 14th day of June, 2021.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN