# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-2428
_____

Dakotans for Health

*Plaintiff - Appellee*

v.

Kristi Noem, South Dakota Governor, in her official capacity;
Mark Vargo, South Dakota Attorney General, in his official capacity;
Steve Barnett, South Dakota Secretary of State, in his official capacity

*Defendants - Appellants*

------------------------------

South Dakota Biotech Association

*Amicus on Behalf of Appellants*
_____

Appeal from United States District Court
for the District of South Dakota
_____

Submitted: March 17, 2022
Filed: November 1, 2022
_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.
_____

GRASZ, Circuit Judge.

This appeal requires us to evaluate the constitutionality of a South Dakota law imposing new obligations on persons compensated to circulate initiative petitions. The district court[1] preliminarily enjoined South Dakota officials from enforcing these requirements. We affirm.

## I. Background

Article III, § 1 of the South Dakota Constitution provides: "The legislative power of the state shall be vested in the Legislature . . . . However, the people expressly reserve to themselves the right to propose measures which shall be submitted to a vote of the electors of the state . . . ." In other words, the South Dakota Constitution protects the right of South Dakota voters to legislate through ballot initiatives. S.D. Const. art. III, § 1. Likewise, the South Dakota Constitution provides voters the right to propose constitutional amendments by initiative. *See* S.D. Const. art. XXIII, § 1. To qualify for the ballot, initiative petitions proposing a constitutional amendment must be "signed by qualified voters equal in number to at least ten percent of the total votes cast for Governor in the last gubernatorial election." *Id.*

Within constitutional bounds, the procedures governing the initiative process are controlled by the South Dakota legislature. *See* S.D. Codified Laws, ch. 2-1. In 2020, the South Dakota legislature passed, and the governor signed into law, Senate Bill 180 ("SB 180"), part of which imposed additional requirements for paid petition circulators in the state and specified penalties for failure to comply with those requirements. This case concerns the constitutionality of those additional requirements.

SB 180 has four relevant provisions. First, it compels paid ballot petition circulators to disclose their name, residential address, email address, phone number,

---

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

government-issued identification, voter registration state, petition sponsor name, and sex offender status prior to circulating any petition for a ballot measure. S.D. Codified Laws § 2-1-1.5. Second, it requires these disclosures to be "available upon request" in a publicly available directory, while the petitions are still being circulated and prior to commencement of the signature verification process. *Id.* §§ 2-1-1.5 and 2-1-1.6. Third, it voids all signatures gathered by the paid circulator if any information is false or if the registration form is incomplete. *Id.* § 2-1-1.5. Fourth, it requires paid circulators and petition sponsors to update the information within seven days of any change. *Id.*

The underlying dispute arose when Dakotans for Health ("DFH"), a South Dakota ballot question committee,[2] sought to place a constitutional amendment measure on South Dakota's 2022 general election ballot. To get on the ballot, DFH would need to submit nearly 34,000 valid signatures to the South Dakota Secretary of State. When DFH filed its complaint, it employed a paid petition circulator, Pam Cole, to help it obtain these signatures. And DFH said it expected to employ more circulators in the future to obtain the signatures necessary to qualify the proposed constitutional amendment for the ballot. But DFH believes SB 180 will chill paid petition circulators from working, thereby hindering DFH from obtaining the signatures to place the constitutional amendment measure on the ballot. Indeed, Cole testified that while she would continue her work circulating petitions, she believed other paid petition circulators would "be unwilling to disclose" the information required by the statute, and as a result would stop working rather than comply with SB 180's disclosure requirements.

DFH sued the relevant South Dakota government officials (collectively, "Appellants" or "South Dakota") in federal court and moved to preliminarily enjoin enforcement of SB 180, arguing many of SB 180's requirements violate First Amendment free speech protections. DFH cited the fact that the South Dakota

---

[2] A ballot question committee is an entity organized to place a question on the ballot for a vote of the people.

legislature previously passed House Bill 1094 ("HB 1094"), which imposed public disclosure requirements like those in SB 180 for *all* ballot petition circulators. Before HB 1094 was adopted, the bill's sponsor was quoted in a news story as stating, "professional out-of-state petition circulators . . . are trying to bring their California and Massachusetts liberal agendas" to South Dakota. He was also quoted as stating the bill would keep away one particular individual's "out-of-state liberal allies." After a district court enjoined HB 1094 as violating the First Amendment, *SD Voice v. Noem*, 432 F. Supp. 3d 991, 1003 (D.S.D. 2020), the same legislator then sponsored SB 180. The only relevant difference between HB 1094 and SB 180 is that whereas HB 1094 applied to all petition circulators, SB 180 applies only to paid petition circulators.

In response to the suit, Appellants countered by arguing that DFH lacked standing to sue and that the preliminary injunction factors did not weigh in favor of injunctive relief. The district court concluded DFH did have standing to sue and held SB 180 likely violated the First Amendment by not being substantially related to South Dakota's interests in election integrity and preventing election fraud. The district court then preliminarily enjoined enforcement of SB 180.

## II. Analysis

On appeal, the Appellants again argue DFH does not have standing to challenge SB 180. Alternatively, they argue the preliminary injunction was unwarranted and improper and thus the district court abused its discretion by entering it. We disagree on both counts.

### A. Standing

We review whether a party has standing de novo. *Dalton v. NPC Int'l, Inc.*, 932 F.3d 693, 695 (8th Cir. 2019). "To establish standing '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"

-4-

*Young America's Found. v. Kaler*, 14 F.4th 879, 887 (8th Cir. 2021) (alteration in original) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *accord Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021). South Dakota does not dispute the second element but argues DFH fails to show an injury in fact and redressability.

There are two types of injuries conferring standing for prospective First Amendment relief. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016). The first occurs when a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). The second occurs when a plaintiff self-censors. *Id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)). Self-censoring occurs when a plaintiff alleges it "would like to engage in arguably protected speech, but that [it] is chilled from doing so by the existence of the statute." *Arneson*, 638 F.3d at 627.

The burden is on DFH, as the plaintiff, to establish standing. *Animal Legal Def. Fund*, 8 F.4th at 718. When assessing standing at the preliminary injunction stage, this circuit has assumed the complaint's allegations are true and viewed them in the light most favorable to the plaintiff. *See, e.g.*, *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020); *Rodgers v. Bryant*, 942 F.3d 451, 454 (8th Cir. 2019).

The First Amendment standing inquiry is "lenient" and "forgiving." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699–700 (8th Cir. 2021). This leniency "manifests itself most commonly in the doctrine's first element: injury-in-fact." *Klahr*, 830 F.3d at 794 (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)). And when, as here, "threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *Id.* (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

Since an evidentiary hearing was waived and because we are only at the preliminary injunction stage, the record here is not extensively developed. In addition to the complaint, DFH relies on the declaration of Cole, a paid petition circulator who worked for DFH, and sworn in-court testimony of Miller Cannizzaro from the HB 1094 litigation.

Cole testified that though she complied with SB 180's disclosure requirements while working for DFH, she believed—based on twenty years' experience in South Dakota politics—many paid circulators will be unwilling to comply with SB 180. She explained DFH's inability to recruit paid circulators will make it much harder for DFH to obtain signatures.

Cannizzaro testified about his efforts in 2015 to circulate a ballot initiative to control payday lending. Cannizzaro explained that during his efforts to collect signatures, people from an organized group tried to stalk him and hinder his ability to collect signatures. According to Cannizzaro, this group followed him around Rapid City, shouted at him, and physically obstructed him from doing his job. This terrified Cannizzaro and caused him to purchase and carry a gun for protection. It also caused him to seek a protection order against the manager of the group, which the court granted. When asked if he would be willing to work as a circulator if the law required him to first provide personal information for use in a public directory, Cannizzaro said he would not "go near anything remotely controversial" because "it was bad enough [to be] followed around town. [He would not] want them to know where [he] lived."

Notwithstanding this evidence, Appellants argue DFH lacks standing to challenge SB 180. After all, DFH is a ballot question committee, and the provisions of the new statute are directed primarily at petition *circulators*. While this argument has superficial appeal, a look at South Dakota's statutory scheme for regulating initiative petitions reveals that South Dakota regulates petition circulators and ballot question committees in such a way that their interests are highly intertwined, if not inseparable.

The purpose of a ballot question committee is to place a question on the ballot, and this is done only through petition circulators. For starters, section 2-1-1.7 of the South Dakota Code ties the registration of paid circulators to ballot question committees. The circulator must pay a fee to the Secretary of State for each ballot question committee "represented by the paid circulator." S.D. Codified Laws § 2-1-1.7. In fact, the relationship is so interconnected that, for all practical purposes, initiative petitions cannot be circulated in South Dakota without a ballot question committee. This is because South Dakota law also requires formation of a ballot question committee, through a statement of organization, "not later than fifteen days after the date" when $500 is spent or raised. *Id.* § 12-27-3. A violation of this requirement is a Class 2 misdemeanor. *Id.* In South Dakota, ballot question committees and circulators, then, are interrelated like an army and its soldiers.

Further, the penalties for violating the law impact both ballot question committees and circulators at the same time.

> If any . . . person or entity compensated by . . . a ballot question committee for purposes of petition circulation . . . commits multiple violations of the law regarding petition circulation, residency of a petition circulator, or campaign finance regulation, the . . . person, or entity, including any person serving as a member of the board or as an officer of the entity, is prohibited from being a . . . petition circulator, and from performing any work for any ballot question committee for a period of four years . . . .

*Id.* § 2-1-21.

Considering DFH's complaint, the Cole declaration, and the plain terms of the statute, we conclude DFH is faced with a concrete, particularized, and actual injury from SB 180. This is because the ability of DFH to reach its audience and gather sufficient signatures is directly impacted by SB 180. The evidence suggests the statute will have the effect of limiting the pool of circulators who will carry DFH's message, thus reducing the size of its audience, and making it less likely it will gather

the necessary signatures. *See Meyer v Grant*, 486 U.S. 414, 422–23 (1988). The statute requires circulators to publicly disclose sensitive personal information if they want to work for DFH or exercise their right to circulate petitions while being compensated for their time or expenses. *Id*. at 423 ("We can take judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay."). The statute also directly forbids a person from working for ballot question committees for four years if he or she commits "multiple" violations, such as failing to publicly disclose his or her home address, email address, phone number, prior home address (if the current residence is less than one year), and sex offender status. *See* S.D. Codified Laws §§ 2-1-1.5 and 2-1-21. And if he or she fails to update this information within seven days of any change, that person also violates the statute. *See id.* § 2-1-1.5.

Section 2-1-1.5 invalidates the signature of every voter on every petition submitted by a paid circulator on behalf of a ballot question committee if the circulator: (a) fails to submit the required personal information prior to gathering any signatures; (b) leaves out his or her email address, phone number, or any other required detail; or (c) supplies incorrect information. Through these provisions, SB 180 affects the number of persons willing to circulate petitions for DFH, the number of persons eligible to circulate for DFH, and thus the ability of DFH to reach its audience and successfully gather enough signatures to place a question on the ballot.

Therefore, DFH has alleged injury in fact sufficient for purposes of standing. Since this injury is redressable through the injunctive relief it seeks, we reject the Appellants' argument that DFH lacks standing.

### B. Preliminary Injunction

When reviewing the issuance of a preliminary injunction, "fact findings are reviewed for clear error, legal conclusions are reviewed de novo, and the 'ultimate decision to grant the injunction' is reviewed for abuse of discretion." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (quoting

*Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 754 (8th Cir. 2018)).

Since DFH seeks to preliminarily enjoin a duly enacted state statute, it must show more than a "fair chance of prevailing" on the merits. *Planned Parenthood Minn., N. D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc). To obtain a preliminary injunction, DFH must establish: "(1) '[it] is likely to succeed on the merits'; (2) '[it] is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in its favor'; and (4) 'an injunction is in the public interest.'" *MPAY Inc. v. Erie Custom Comp. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020) (quoting *Wise v. Dep't of Transp.*, 943 F.3d 1161, 1165 (8th Cir. 2019)).

### 1. Merits

The First Amendment, as incorporated by the Fourteenth Amendment, prohibits states from "abridging the freedom of speech." This protection applies to SB 180 because petition circulation is "core political speech where First Amendment protection is at its zenith." *SD Voice v. Noem*, 987 F.3d 1186, 1191 (8th Cir. 2021) (cleaned up) (quoting *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999)). Because DFH brings a facial First Amendment challenge to SB 180, it "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

To determine the appropriate level of scrutiny for a speech regulation, the court must consider "the nature of the regulation." *Calzone v. Summers*, 942 F.3d 415, 423 (8th Cir. 2019) (en banc). On its surface SB 180 is structured as a disclosure law. A statute compelling disclosure of information to the government related to political activity is typically subject to "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383. Yet DFH argues we should apply "strict scrutiny" instead because this

law burdens core political speech. While this argument may have merit,[3] we need not decide it because we conclude the statute fails under exacting scrutiny.

Exacting scrutiny is just what its name says—exacting. It is just short of strict scrutiny. First, exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Reed*, 561 U.S. at 196). But this is just part of the analysis. Though "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Id.*

South Dakota's asserted interests here—prevention of corruption and protection of the integrity of the ballot initiative process—are strong. "[A] state's interest in protecting the integrity of its initiative processes [is] 'paramount.'" *Miller v. Thurston*, 967 F.3d 727, 740 (8th Cir. 2020) (quoting *Hoyle v. Priest*, 265 F.3d

---

[3] "To determine whether a rule is a disclosure requirement, or something more, [this court looks] to see the effect of the provision." *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 949 (8th Cir. 2018) (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014)); *accord Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 875 (8th Cir. 2012) (en banc) ("Allowing states to sidestep strict scrutiny by simply placing a 'disclosure' label on laws . . . risks transforming First Amendment jurisprudence into a legislative labeling exercise."). By its terms, SB 180 imposes disclosure and payment obligations *before* speech occurs, *see* S.D. Codified Laws § 2-1-1.5, conditions speech on one's willingness to provide sensitive personal information, *see id.*, and, in some cases, *forbids* future speech for four years, *id.* § 2-1-21. In addition, compliance determines whether the efforts of the petition circulator to achieve a political outcome are successful: "If a paid circulator fails to file the registration required by this section before circulating a petition, or if the registration is incomplete, or if any statement included in the paid circulator's certification is determined to be false, any signatures collected by the paid circulator are void and may not be counted." *Id.* § 2-1-1.5.

-10-

699, 704 (8th Cir. 2001)). This interest includes not only combatting fraud and corruption, but also preventing mistakes like duplicate signatures and signatures from ineligible voters. *Id.* This "interest also extends more generally to promoting transparency and accountability in the electoral process . . . ." *Reed*, 561 U.S. at 198. And while the district court was skeptical the Appellants put forth an adequate showing to establish that these asserted interests were not pretextual, we note that South Dakota was "not required to present 'elaborate, empirical verification of the weightiness of [its] asserted justifications.'" *Miller*, 967 F.3d at 740 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 349, 364 (8th Cir. 1997)). Thus, assuming without deciding South Dakota's asserted interests are not pretextual, we will proceed to evaluate the fit between them.

The Appellants argue SB 180's requirements are substantially related to its important interests in election integrity. They correctly note that "states have 'considerable leeway to protect the integrity and reliability of the initiative process.'" *Miller*, 967 F.3d at 737 (quoting *Buckley*, 525 U.S. at 191). Having up-to-date address information helps the state contact paid circulators if there is an issue, which could have alleviated issues in the prior litigation. This echoes the Supreme Court's acknowledgment that "[p]ublic disclosure can help cure the inadequacies of the verification and canvassing process." *Reed*, 561 U.S. at 198. And as the Court noted and as seen here, "the secretary's verification and canvassing will not catch all invalid signatures . . . ." *Id.* These disclosures likewise promote transparency by letting the public know who is circulating petitions.

The Appellants further argue the burdens imposed by SB 180 on speech are not great. They characterize as a de minimis burden the requirements that paid circulators certify they are at least eighteen years old and provide their home address, email address, phone number, state of their driver's license, state of voter registration, and the name of petition sponsor. Thus, in the Appellants' view, these reasonable disclosure requirements are substantially related to its important interests. A closer look reveals the law is not narrowly tailored to serve these interests and cannot survive exacting scrutiny.

First, the asserted interests in election integrity are general in nature, but the statute does not apply generally—it applies only to those who are paid. In *Meyer*, the Court held Colorado's ban on paying petition circulators violated the First Amendment. 486, U.S. at 428. While South Dakota has not banned paying circulators, it has instead subjected them to a set of disclosure requirements not applicable to volunteer circulators. It does so on the ground that paid circulators pose a greater threat to the integrity of the petition process. The Supreme Court has stated, however, that "absent evidence to the contrary," it is "not prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot." *Buckley*, 525 U.S. at 203–04 (quoting *Meyer*, 486 U.S. at 426). In *Buckley*, based on the lack of evidence, the Court concluded disclosure requirements that applied only to paid circulators failed exacting scrutiny. *Id.* at 204.

The challenged statute effectively thumbs its nose at both *Meyer* and *Buckley*. We agree with the district court that, at this stage of the proceeding, the "State has not shown that paid petition circulators create a greater risk of fraud than volunteers." Evidence of past instances where signatures on petitions gathered by paid circulators were invalidated does not, by itself, show corruption particular to paid circulators or demonstrate a greater need for regulation of paid circulators than for circulation by volunteers. Like the district court, we conclude, "The State has not shown that tighter restrictions on paid circulators [in the form of SB 180] have a substantial relationship to a sufficiently important governmental interest."

The second flaw in Appellants' argument relates to the timing of the required disclosure. The statute does not just require the disclosed information be maintained by the ballot committee or even by the Secretary of State in case it is needed during the signature verification process. Rather, it is required to be available for public viewing upon request—and not just during the verification process that occurs after circulation is completed, but prior to the time any circulation occurs. *See* S.D.

-12-

Codified Laws § 2-1-1.6. This is a recipe for harassment, especially given the requirement for public disclosure of circulators' phone numbers, residential addresses, and email addresses.

The Supreme Court has addressed similar concerns in the ballot initiative context before, and it has come down on the side of protecting the personal information of circulators during the circulation process. *See Buckley*, 525 U.S. at 198–200. In *Buckley,* the Court contrasted disclosure of personal contact information in circulator affidavits submitted after circulation of a petition with the compelled disclosure of a circulator's name "at the time a circulator is soliciting signatures . . . ." *Id.* at 198–99. The Court invalidated a name badge requirement since it "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest." *Id.* at 199. *See also Calzone*, 942 F.3d at 424–25 ("As the Supreme Court has recognized, speakers ordinarily have the right to keep their identities private."). While a public directory of circulator names differs from a name badge, we note the *Buckley* decision was made after considering evidence of "reluctance of potential circulators to face recrimination and retaliation that bearers of petitions on 'volatile' issues sometimes encounter . . . ." *Buckley*, 525 U.S. at 198. This concern applies with equal force, if not more, to a public directory.

Taken together, the pre-circulation disclosure requirements in section 2-1-1.5 are intrusive and burdensome. As such they present a severe burden on speech. We agree with the district court that the pre-circulation disclosure and certification of personal information, as well as the seven-day update requirement, are not substantially related to the State's interests. While upfront disclosure of petition sponsorship and petition funding may serve an interest in transparency, disclosing a circulator's phone number, home address, and email address prior to the signature verification process are not substantially related to South Dakota's interests.

More importantly, for purposes of exacting scrutiny, while the State's interests are strong, they do not stand in isolation to justify any regulatory scheme it puts forward. Rather, the statute itself must be narrowly tailored to meet these asserted interests. *Bonta*, 141 S. Ct. at 2383. "[A] substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored." *Id.* at 2384. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

Several of the aforementioned flaws show "[t]here is a dramatic mismatch . . . between the interest[s] that the [State] seeks to promote and the disclosure regime that [it] has implemented in service to that end." *Id.* at 2386. Indeed, SB 180's requirement that paid circulators disclose their sexual offender status is not narrowly tailored to any state interest in election integrity. And South Dakota presents no evidence paid circulators are more likely to be sex offenders than volunteer circulators. The State may well have public safety interests related to disclosure of sex offender status, but those interests were not asserted here. Likewise, the requirement that any change in a circulator's phone number, home address, or e-mail address be updated within seven days is not narrowly tailored to serve the State's interests in election integrity. While having up-to-date contact information would facilitate communication with circulators who may be engaging in abusive practices, the provision applies only to paid circulators and the penalty for having an outdated email address, for example, while still having an accurate phone number and mailing address, is invalidation of all voter signatures gathered by the circulator.

But even some of the more seemingly innocuous requirements suffer from a mismatch in fit. Being forced to publicly disclose one's phone number, email address, and residential address in order to exercise the right to circulate a petition— even as a paid circulator—is chilling in today's world. The risks of public disclosure "are heightened in the 21st century and seem to grow with each passing year, as 'anyone with access to a computer can compile a wealth of information about'

-14-

anyone else, including such sensitive details as a person's home address or the school attended by his children." *Bonta*, 141 S. Ct. at 2388 (alteration in original) (quoting *Reed*, 561 U.S. at 208 (Alito, J., concurring)). The personal information required by SB 180—upon penalty of criminal sanctions as well as the invalidation of all signatures on a petition—may subject circulators of controversial petitions to harassment or even risk of personal harm. The required disclosure of this information *before circulation even commences* is not narrowly tailored to South Dakota's interests. The information is not needed for verification of the petition until after circulation is completed. And if the purpose is to inform voters that the circulator is an "out-of-state interloper," disclosing a state of residence would suffice.

All of this leads us to conclude DFH is likely to succeed in showing SB 180 is facially invalid as overbroad in that it violates the First Amendment in a substantial number of its applications. It discriminates against paid circulators for reasons unrelated to legitimate state interests, reduces the pool of circulators available to DFH, and restricts the speech of DFH by sweeping too broadly in its requirements. Put another way, SB 180 is not narrowly tailored to serve South Dakota's important interests.

### 2. Remaining Preliminary Injunction Factors

We next turn to the issue of irreparable harm. To show irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)). We agree with the district court that DFH has shown irreparable harm. DFH cannot sue for money damages. And as discussed above, SB 180 affects core political speech by impacting the number of persons willing to circulate petitions for DFH, the number of persons eligible to circulate for DFH, and thus the ability of DFH to reach

its audience and successfully gather enough signatures to place a question on the ballot.  This harm is irreparable absent injunctive relief.

Finally, we conclude the balance of harms and the public interest also favor DFH.  While South Dakota has important interests in protecting the integrity of the ballot initiative process, it has no interest in enforcing overbroad restrictions that likely violate the Constitution.

### C.  Severability

A "preliminary injunction 'must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law.'"  *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022–23 (8th Cir. 2015) (omission in original) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).  Relatedly, South Dakota's Supreme Court says a statute should be severed "if the remainder can stand by itself and if it appears that the Legislature would have intended the remainder to take effect without the invalidated section." *Currey v. Currey*, 650 N.W.2d 273, 278 (S.D. 2002) (cleaned up) (quoting *Simpson v. Tobin*, 367 N.W.2d 757, 768 (S.D. 1985)).

In addition to its regulation of paid circulators, SB 180 requires that a petition sponsor, like DFH, provide a list to the Secretary of State of each person acting as a paid circulator along with the compensation rate.  *See* S.D. Codified Laws § 2-1-1.5.  It is not entirely clear whether this requirement applies pre-circulation or at some later time.  However, since it also requires petition sponsors to update this information within seven days of any change, the requirement apparently applies for at least some time (if not at all times) prior to completion of the circulation process.

DFH challenged the entirety of SB 180 and the district court enjoined SB 180 in its entirety.  However, on appeal from the entry of the preliminary injunction, neither party developed arguments in any meaningful sense either as to the validity of the petition sponsor disclosure provisions, standing separately, or as to their

-16-

severability from the remainder of SB 180. We therefore decline to second guess the scope of the preliminary injunction, and we leave it to the district court to determine in any future proceedings whether these portions of SB 180 can survive scrutiny and whether they are otherwise severable.

### III. Conclusion

We find DFH has satisfied the requirements for issuance of a preliminary injunction and that the district court did not abuse its discretion in entering a preliminary injunction against SB 180.

_____